## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THOMAS E. PEREZ, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,** | |
| *Plaintiff,* | **Judge Nora Barry Fischer** |
| **v.** | **Civil Action No. 2:13-CV-1118** |
| **DAVISON DESIGN & DEVELOPMENT, INC., a corporation; and GEORGE M. DAVISON, individually and as a Corporate Officer of the aforementioned corporation,** | *Electronically Filed* |
| *Defendants.* | |

### DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF THOMAS E. PEREZ, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR

Amy E. Dias (Pa. Bar No. 52935)
Brandon J. Lester (Pa. Bar No. 310208)
aedias@jonesday.com
blester@jonesday.com
JONES DAY
500 Grant Street, 45th Floor
Pittsburgh, PA  15219
412-391-3939
412-394-7959 (fax)

Eric S. Dreiband (*admitted pro hac vice*)
esdreiband@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
202-879-3939
202-626-1700 (fax)

*Counsel for Defendants*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................ii

SUMMARY OF UNDISPUTED MATERIAL FACTS ................................................................ 2

LEGAL STANDARD ................................................................................................................ 6

ARGUMENT ........................................................................................................................... 7

    A.    The FLSA exempts employees of a "retail or service establishment" who satisfy minimum wage and commission requirements from its overtime requirements ................................................................................................... 7

    B.    Davison is a "retail or service establishment" within the meaning of § 207(i), and thus its Sales Representatives are not entitled to overtime premiums ................................................................................................... 12

CONCLUSION ...................................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Page**

**CASES**

*Alvarado v. Corp. Cleaning Serv., Inc.*,
    719 F. Supp. 2d 935 (N.D. Ill. 2010) ...................................................................10

*Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*,
    890 F. Supp. 2d 602 (W.D. Pa. 2012) (Fischer, J.)................................................6

*English v. Ecolab, Inc.*,
    Case No. 06 Civ. 5672 (PAC), 2008 U.S. Dist. Lexis 25862 (S.D.N.Y. 2008) ......9, 11, 12, 16

*Equal Employment Opportunity Comm'n v. United States Steel Corp.*,
    Civ. Action No. 10-1284, 2013 U.S. Dist. LEXIS 22748 (W.D. Pa. Feb. 20, 2013)
    (Fischer, J.).............................................................................................................6

*Fed. Trade Comm'n v. Davison Assocs., Inc.*,
    431 F. Supp. 2d 548 (W.D. Pa. 2006).............................................................13, 14

*Foehl v. United States*,
    238 F.3d 474 (3d Cir. 2001)....................................................................................6

*Gatto v. Mortgage Specialists of Illinois, Inc.*,
    442 F. Supp. 2d 529 (N.D. Ill. 2006) ...................................................................10

*Gieg v. DDR, Inc.*,
    407 F.3d 1038 (9th Cir. 2005) ................................................................................8

*La Parne v. Monex Deposit Co.*,
    714 F. Supp. 2d 1035 (C.D. Cal. 2010) ...............................................................10

*Selz v. Investools, Inc.*,
    Case No. 2:09-CV-1042(TS), 2011 U.S. Dist. Lexis 9364 (D. Utah Jan. 27, 2011)..............13

*Viciedo v. New Horizons Computer Learning Ctr. of Columbus, Ltd.*,
    246 F. Supp. 2d 886 (S.D. Ohio 2003) ...................................................11, 13, 16

*Wells v. TaxMasters, Inc.*,
    Case No. 4:10-cv-02373, 2012 U.S. Dist. LEXIS 133825 (S.D. Tex. Sept. 18, 2012) .9, 11, 12

**STATUTES**

29 U.S.C. § 207(i) ............................................................................................... passim

29 U.S.C. § 207(a)(1)....................................................................................................7

29 U.S.C. §§ 207(b), (f), (g), (i)–(k), (m)–(r) ..................................................7

29 U.S.C. § 213(a)(2) (repealed Nov. 17, 1989)...............................................8

29 U.S.C. § 213(b)(1)–(30)................................................................................7

35 U.S.C. § 297................................................................................5, 6, 15

35 U.S.C. § 297(a)(1)–(5), (b), (c)(2) ...............................................................15

29 U.S.C. § 201 *et seq*....................................................................................1

Ohio Rev. Code. § 1345.61 *et seq.* ........................................................15–16

## OTHER AUTHORITIES

29 C.F.R. § 779.313 ........................................................................................8

29 C.F.R. § 779.318(a)............................................................................9, 10, 16

29 C.F.R. § 779.320 ........................................................................................9

29 C.F.R. § 779.334 ......................................................................................11

29 C.F.R. § 779.414 ........................................................................................7

37 C.F.R. § 4.1 *et seq.*..................................................................................15

Advance Healthcare Network (Nov. 4, 2009), *available at* http://health-
    information.advanceweb.com/editorial/content/editorial.aspx?cc=209442 .........................14

Fed. R. Civ. P. 56 ...........................................................................................6

H.R. Rep. No. 106-464 (1999)........................................................................15

Pittsburgh Business Times (May 7, 2007), *available at*
    http://www.bizjournals.com/pittsburgh/stories/2007/05/07/focus4.html ................................14

Pittsburgh Post-Gazette (July 16, 2006), *available at* http://www.post-
    gazette.com/lifestyle/2006/07/16/Stuff-It-s-a-bike-it-s-a-
    skateboard/stories/200607160214........................................................14

U.S. Dep't of Labor, WHD Opinion Letter, FLSA2003-1 (March 17, 2003), *available at*
    http://www.dol.gov/whd/opinion/FLSA/2003/2003_03_17_1_FLSA.htm............................7

U.S. Dep't of Labor, WHD Opinion Letter, FLSA2005-44 (Oct. 24, 2005), *available at*
    http://www.dol.gov/whd/opinion/FLSA/2005/2005_10_24_44_FLSA.htm.........................10

U.S. Dep't of Labor, WHD Opinion Letter, FLSA2006-22 (June 23, 2006), *available at*
http://www.dol.gov/whd/opinion/FLSA/2006/2006_06_23_22_FLSA.htm..........................11

Plaintiff seeks allegedly unpaid overtime premiums for 257 current and former Sales Representatives at Defendant Davison Design & Development, Inc. ("Davison").  These claims have no merit because Davison is a "retail or service establishment" under 29 U.S.C. § 207(i). As such, its Sales Representatives—who undisputedly make more than one and one half times the minimum wage and earn more than half their compensation from commissions[1]—are exempt from the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*. ("FLSA") overtime requirements.

Davison easily qualifies as a "retail or service establishment."  29 U.S.C. § 207(i). Though it provides unique services—assistance for aspiring inventors seeking to develop a product idea and submit it to corporations for licensing—Davison sells these services directly to the general public in packages customized to meet their clients' needs.  These services meet the everyday needs of the community, namely the need to capitalize on one's own ingenuity.  It does not manufacture products or engage in resale; to the contrary, it sits at the end of the stream of distribution, selling its services only once, and to the only individuals who use them.  Davison's direct relationship with its clients is recognized in the industry, and indeed numerous consumer protection laws regulate how Davison provides these services.

For these reasons, discussed more fully below, this Court should grant summary judgment for the Defendants and dismiss the Complaint with prejudice as a matter of law.

---

[1] While the Complaint alleges that Davison does not satisfy the § 207(i) exception because it lacks a retail concept, Plaintiff does not dispute the fact that the Sales Representatives were paid at the appropriate rate and were paid on commission as required by § 207(i).  As such, the only § 207(i) issue before the Court is whether Davison is a "retail or service establishment."

## SUMMARY OF UNDISPUTED MATERIAL FACTS[2]

Based in Pittsburgh, Pennsylvania, Davison is a one-of-a-kind company that assists aspiring inventors in realizing their ideas and presenting them to corporations.  (SUMF ¶¶ 1–2.) Davison's business primarily consists of selling two different individualized invention research, development, and design service packages directly to its inventor clients.[3]  (*Id*. ¶¶ 2–3.)  These package sales accounted for ninety-eight percent (98%) of its annual total revenues in 2011, 2012, and 2013.  (*Id*. ¶ 3.)  Any member of the general public may contract with Davison for these services, and it has entered into agreements with 58,865 individual clients in the past five years alone.  (*Id*. ¶ 4.)

The specific services provided under the two service packages can vary depending on the nature and sophistication of the invention at issue and the progress that the client has already made with his or her idea.  (*Id*. ¶ 5.)  In short, Davison customizes its services for each client, and dispenses its services directly to these individual consumers.  (*Id*.)

In general, the first package covers pre-development and representation services.  (*Id*. ¶ 6.) Through this package, Davison provides several different services, including:  (1) reviewing whether similar products are available for sale, as well as the component materials, advertising, pricing, and packaging of those products; (2) reviewing patent information related to the product; (3) identifying a target corporation that would be willing to receive information on the product and consider it for licensing; and (4) engaging in one-on-one sessions with the inventor concerning his or her product and development planning.  (*Id*.)

---

[2] All references to "SUMF ¶ __" shall be to Defendants' Statement of Undisputed Material Facts, which is being filed contemporaneously herewith.

[3] Davison also creates and licenses certain inventions on its own on a limited basis, but does not engage in any manufacturing, sale, or resale of these products whatsoever.  (SUMF ¶ 17.)

Davison also creates an Idea to Product Portfolio for its clients that collects and assembles the results of these services to assist its clients in considering the challenges ahead more fully and determining whether to pursue continued product development.  (*Id*. ¶ 7.)

Davison's second-phase agreement covers work to further develop, design, and refine the client's product so that it can be presented to corporations and other entities that might be interested in licensing the product idea.  (*Id*. ¶ 8.)  The specific services provided as part of this package will again vary based on the client's needs.  (*Id*.)  However, as part of this package, Davison generally prepares presentation materials, a product sample, and a packaging sample, and performs certain other related services.  (*Id*.)

As to the presentation materials, Davison's Development Team may:  (1) review the proposed product, its features and functions, and the abilities of the target corporation to manufacture the product; (2) identify the specific objective that the product is designed to meet (i.e., the problems that it will solve); (3) create preliminary product and packaging designs, which may include efforts to make the product more cost-effective; and (4) create virtual, three-dimensional renditions of the product and packaging and full color prints of them for client approval.  (*Id*. ¶ 9.)

The creation of product samples may involve numerous different steps, including:  (1) analyzing the product to identify cost-efficient and effective means of producing it in line with the target corporation's manufacturing methods; (2) creating production drawings and/or Computer Aided Drawings ("CAD"); (3) transferring production and/or CAD drawings to computer code for use in the mechanical process of producing the product sample; (4) designing circuit boards if applicable to the product; (5) building the actual product sample, including preparing the fabrication machines, preparing the raw materials, and then creating the necessary

parts; (6) assembling and providing a professional finish to the product sample; and (7) taking photographs of the product sample.  (*Id*. ¶ 10.)

For the packaging samples, Davison's Packaging Team may:  (1) analyze the appropriate packaging style, considering factors like product size, weight, and fragility; (2) create production and/or CAD drawings of packaging; (3) transfer production and/or CAD drawings to computer code for use in the mechanical process of producing the packaging sample; (4) build the actual packaging sample, including preparing the fabrication machines, preparing the raw materials, and then creating the necessary parts; (5) assemble and provide a professional finish to the packaging sample; and (6) take photographs of the packaging sample.  (*Id*. ¶ 11.)

Davison further takes certain steps to finalize the materials developed and produced in this process, including:  (1) placing those items together to create a final product; (2) performing an integrity review of the final product; and (3) preparing an appropriate shipping container.  (*Id*. ¶ 12.)  Davison also provides its clients with a final Executive Summary that summarizes the problem that the product solves, highlights the product's key features and components and the composition of them, and provides full color photographs of the product and packaging.  (*Id*.)  Additionally, depending on client needs/requests, Davison may provide production quotes for acquired ideas and/or information for use in a provisional patent application.  (*Id*.)

Davison also provides some services related to the two above packages (e.g., repairing and recreating product samples produced as part of these packages as needed).  (*Id*. ¶ 13.)

While Davison's specific approach under these two packages varies based on the nature and sophistication of the client's idea and the steps that the client has already taken to bring his or her idea to life, Davison does not create any products for sale or resale; rather, its services are limited to assisting in the development process and creating prototypes and related materials to

-4-

be used in presenting the idea to potentially interested corporations.  (*Id*. ¶¶ 14–15.)  None of the items that Davison produces as part of these processes (including the prototype inventions, packaging samples, and related materials) are ever sold or resold to any other entities.  (*Id*. ¶ 14.)  In short, Davison only serves the individuals who purchase its service packages, and those services end once Davison completes the development and design services identified therein.  (*Id*. ¶ 15.)  Further, Davison is not involved in the actual manufacture or sale of its clients' products whatsoever; those matters are left to Davison's clients to separately contract with the corporations or other entities that review and license their product ideas.  (*Id*.)  Additionally, Davison does not guarantee that any idea will be successful or make a profit; to the contrary, it merely represents to its clients that it will make its best effort to professionally design a sample, packaging, and presentation materials that will give the potential licensee a clear understanding of the idea.  (*Id*. ¶ 16.)

In these business dealings, Davison must comply with certain laws that regulate how invention promotion companies sell their services to individuals, including the American Inventors Protection Act of 1999, 35 U.S.C. § 297, which requires Davison to disclose certain information to potential clients before contracting with them.  (*Id*. ¶ 18.)  Davison fully complies with this requirement, as demonstrated by its notice to inventors and its Affirmative Disclosure Statement.[4]  (*Id*.).  Further, Davison is subject to certain state-specific laws, and it has developed different contracts for those states that incorporate all such requirements.  (*Id*. ¶ 19.)

---

[4] Davison's current disclosure statement is attached to the Declaration of Frank Vescio as Exhibit A.  In addition to setting forth the required disclosures, this statement also briefly describes Davison's services, and refers to a "representation agreement" option for individuals who solely seek assistance in securing licensing or distribution channels for existing products.  Because Davison provides those services on a very infrequent basis and they do not constitute a significant source of its annual revenues, they are not discussed in detail here.

Davison currently employs one-hundred fifty (150) Sales Representatives (also referred to with the title of "Director of New Products") to sell its services to potential clients.  (*Id*. ¶ 20.) Sales Representatives' duties consist entirely of speaking with current and prospective clients to discuss their invention ideas, and, as appropriate, selling one or both of Davison's two service packages to them, in addition to handling minor paperwork associated with such sales.  (*Id*. ¶ 22.) These individuals engage with clients primarily over the telephone, though clients and prospective clients also occasionally visit Davison's offices for in-person meetings with Sales Representatives to discuss Davison's services.  (*Id*. ¶ 21.)  In 2011, for example, five hundred sixteen (516) clients or prospective clients visited Davison's offices.  (*Id*.)

## LEGAL STANDARD

Summary judgment is appropriate here because "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law."  *Foehl v. United States*, 238 F.3d 474, 477 (3d Cir. 2001) (internal quotation marks omitted).  "Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a district court must enter summary judgment against a party 'who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Equal Employment Opportunity Comm'n v. United States Steel Corp.*, Civ. Action No. 10-1284, 2013 U.S. Dist. LEXIS 22748, *21 (W.D. Pa. Feb. 20, 2013) (Fischer, J.) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Further, "[s]ummary judgment may be granted when no 'reasonable jury could return a verdict for the nonmoving party.'"  *Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*, 890 F. Supp. 2d 602, 606 (W.D. Pa. 2012) (Fischer, J.) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In considering such a motion, the Court must view the evidence and resolve doubts in favor of the non-moving party.  *Id*.

## ARGUMENT

The undisputed facts demonstrate that Davison is entitled to judgment as a matter of law. Davison is plainly a "retail or service establishment" under 29 U.S.C. § 207(i), and thus its Sales Representatives—who undisputedly meet the minimum wage and commission requirements for this exemption—are exempt from the FLSA's overtime wage requirements.

### A.     The FLSA exempts employees of a "retail or service establishment" who satisfy minimum wage and commission requirements from its overtime requirements.

Although the FLSA generally requires employers to pay employees one and one-half times their regular rate of pay for all hours worked over 40 in a given workweek, *see* 29 U.S.C. § 207(a)(1), numerous exceptions to that rule exist, *see generally* 29 U.S.C. §§ 207(b), (f), (g), (i)–(k), (m)–(r), 213(a)(1)–(17) & (b)(1)–(30).   Congress specifically enacted 29 U.S.C. § 207(i), "to relieve an employer from the obligation of paying overtime compensation to certain employees of a retail or service establishment paid wholly or in greater part on the basis of commissions." 29 C.F.R. § 779.414.   Section 207(i) provides that:

> No employer shall be deemed to have violated subsection (a) of this section [the FLSA's overtime requirement] by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services.

29 U.S.C. § 207(i).

As the statute makes clear, when a retail or service business "is operated as a single establishment, all employees of the establishment are exempt if their compensation complies with the requirements of § 207(i).   Employee duties are irrelevant."   U.S. Dep't of Labor, Wage and Hour Division ("WHD") Opinion Letter, FLSA2003-1 (March 17, 2003), *available at* http://www.dol.gov/whd/opinion/FLSA/2003/2003_03_17_1_FLSA.htm (last visited Dec. 27,

-7-

2013.  Accordingly, then, § 207(i) exempts Davison's employees from the FLSA's overtime obligations if:  (1) Davison is "a retail or service establishment"; (2) the employees' regular rate of pay is more than one and one-half times the minimum wage;  and (3) more than half of the employees' compensation "represent commissions on the sale of goods or services." 29 U.S.C. § 207(i); *see also Gieg*, *v. DDR, Inc.*, 407 F.3d 1038, 1046 (9th Cir. 2005).

In this case, the Government does not contest the second and third elements.  *See* Compl. ¶ VII.  The only issue is whether Davison is a "retail or service establishment" for purposes of § 207(i).  "The inquiry focuses on the retail sales of an 'establishment' as a whole and not on the individual activity of a particular employee." *Gieg, Inc.*, 407 F.3d at 1047; *see also id*. at 1049 (noting further that "the exemption is not limited to those employees who sell retail goods and services" if the company qualifies as a "retail or service establishment").  Because Davison is a retail or service establishment for § 207(i) purposes, its commissioned employees—the sales representatives at issue in this case—are exempt from the FLSA's overtime requirements and summary judgment in Davison's favor is appropriate

To qualify as a "retail or service establishment," Davison must be "an establishment 75 per centum of whose annual dollar value of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry."  29 U.S.C. § 213(a)(2) (repealed Nov. 17, 1989)[5]; *see also* 29 C.F.R. §§ 779.312, 779.313 (incorporating these requirements).  Davison satisfies this requirement because it does not sell any goods or

---

[5] Although 29 U.S.C. § 213(a)(2), which set forth a separate exemption for retail entities, was repealed in 1989, courts still use it to define the term "retail or service establishment" in 29 U.S.C. § 207(i), as Congress intended for that definition to control in this context.  *See Gieg*, 407 F.3d at 1047.

services for resale and ninety-eight percent (98%) of its annual sales come from selling individualized service packages to aspiring inventors.  (SUMF ¶ 3.)

Davison must also have a "retail" concept in order to qualify as a "retail or service establishment."  If so, its Sales Representatives—who indisputably meet the baseline wage and commission requirements—are exempt from the FLSA overtime requirements, as the Department of Labor has recognized.

Although the FLSA does not specifically define the term "retail," companies with a retail concept must exhibit several traits.  **First**, they must sell goods or services directly to the general public.  *See* 29 C.F.R. § 779.318(a).  There is no in-person requirement, though, such that businesses that contact customers primarily by telephone can have a retail concept.  *See Wells v. TaxMasters, Inc.*, Case No. 4:10-cv-02373, 2012 U.S. Dist. LEXIS 133825, *18 (S.D. Tex. Sept. 18, 2012) ("Certainly Defendants sold their services to the general public.  In fact, the Plaintiffs in this actions worked as salespeople in a call center and sold Defendants' services directly to consumers."); *English v. Ecolab, Inc.*, Case No. 06 Civ. 5672 (PAC), 2008 U.S. Dist. Lexis 25862, *31 (S.D.N.Y. 2008) ("[T]elephone contact is sufficient to satisfy the public accessibility requirement.").

**Second**, retail and service companies meet the everyday needs of their communities.  *See* 29 C.F.R. § 779.318(a).  These companies need not sell common goods like food and clothing; indeed, a business can have a retail concept even if it sells goods or services that almost never have a family or non-commercial use.  *See id* at (b).  Further, Davison need not "provide a product or service used by each member of the community on [a] daily basis."  *Wells*, 2012 U.S. Dist. LEXIS 133825, at *18.  Both the Government and the federal courts recognize numerous niche industries as having a retail concept.  *See* 29 C.F.R. § 779.320 (listing, inter alia, billiard

-9-

parlors, coal yards, crematories, embalming establishments, farm implement dealers, fur repair and storage shops, millinery shops, piano tuning establishments, scalp-treatment establishments, taxidermists, and undertakers as having retail concepts); *Alvarado v. Corp. Cleaning Serv., Inc.*, 719 F. Supp. 2d 935, 944 (N.D. Ill. 2010) (finding a window washing service to have a retail concept because "members of the public require and demand clean windows in their homes, workplaces, hotel rooms, hospitals, schools, and shopping centers"); U.S. Dep't of Labor, WHD Opinion Letter, FLSA2005-44 (Oct. 24, 2005), *available at* http://www.dol.gov/whd/opinion/FLSA/2005/2005_10_24_44_FLSA.htm (last visited Dec. 27, 2013) (carpet and upholstery cleaning company).

This element is met, then, as long as the goods or services offered support a basic need of the community, even if the number of people who act on it is limited.  Further, in evaluating this issue, the Court should not focus solely on the service itself, but rather should look more broadly at the reasons why it is used.  *See La Parne v. Monex Deposit Co.*, 714 F. Supp. 2d 1035, 1044 (C.D. Cal. 2010) ("While the purchase of precious metals may not initially sound like a basic need of members of the community, it is when looking to the two basic purposes for which buyers purchase precious metals—collecting the metals and investing the metals.  These two purposes are integral uses of the community.").

**Finally**, retail and service companies operate at the very end of the stream of distribution, dispense their goods or services in small quantities, and do not engage in manufacturing.  *See* 29 C.F.R. § 779.318(a).  To be clear, an entity operates at the end of the stream of distribution if "there is no set plan for resale at the time [its goods or services are] being sold."  *La Parne*, 714 F. Supp. 2d at 1044; *see also Gatto v. Mortgage Specialists of Illinois, Inc.*, 442 F. Supp. 2d 529, 541 (N.D. Ill. 2006) ("In the case of a service establishment, the end of the distribution stream

has been described as providing a service with a distinct beginning and end.") (quotations omitted); 29 C.F.R. § 779.334 (stating that a sale of services is for resale "where the seller knows or has reasonable cause to believe [the services] will be resold").  As long as Davison sells its services directly to the individuals who actually use them and does not pass them on to others (as opposed to, for example, manufacturing products to sell to a middleman), it will meet these factors.

Where goods or services are individually tailored to a specific client, the business shows the hallmarks of a retail concept.  *See Wells*, 2012 U.S. Dist. LEXIS 133825, at *20 (finding a business to be a retail establishment when it customized tax services based on client needs); U.S. Dep't of Labor, WHD Opinion Letter, FLSA2006-22 (June 23, 2006), *available at* http://www.dol.gov/whd/opinion/FLSA/2006/2006_06_23_22_FLSA.htm (last visited Dec. 27, 2013) (finding plumbing service companies to have a retail concept given that, "[b]y virtue of the nature of the sales and services provided, none of the sales and services by service technicians are for resale").  That remains true even when that client then uses those services in operating its own business, or passes the costs of those services on to its customers:

> Here . . . the Plaintiffs have presented no evidence that the actual computer training sold by [Defendant] to its customers is ever passed along in any form to consumers.  The fact that [Defendant's] customers use their training as administrative support in businesses that produce other goods and services, and then pass along all overhead costs to consumers, is too tenuous a connection to constitute a "resale" of the computer services themselves.

*Viciedo v. New Horizons Computer Learning Ctr. of Columbus, Ltd.*, 246 F. Supp. 2d 886, 893 (S.D. Ohio 2003); *see also English*, 2008 U.S. Dist. Lexis 25862, at *38–39 (rejecting claim that the sale of pest elimination services to a business was "a sale for resale" merely because the customer "passe[d] the cost of such good and services on to the end consumer" of its business).

-11-

**B.      Davison is a "retail or service establishment" within the meaning of § 207(i), and thus its Sales Representatives are not entitled to overtime premiums.**

Davison plainly satisfies each of the above requirements of Section 7(i).  As to the first element, Davison sells its services—assistance in researching and developing invention ideas and preparing them for submission to corporations—directly to the general public.  Any individual or entity can contract for these services, and those who do receive service package(s) tailored to their individual needs and invention ideas.  (SUMF ¶¶ 4–5.)  The fact that clients largely contact Sales Representatives by phone (*id.* ¶ 21) does not alter this analysis.  *See,* as discussed *supra*, *Wells*, 2012 U.S. Dist. LEXIS 133825, at *18; *English*, 2008 U.S. Dist. Lexis 25862, at *31.  In all events, though, Davison does some face-to-face business with its clients; for example, five hundred sixteen (516) clients and prospective clients visited its offices in 2011.  (SUMF ¶ 21.)

Next, Davison plainly meets the everyday needs of the community.  Davison's clients—58,865 aspiring inventors (all members of the general public) in the past five years alone (SUMF ¶ 4)—hire Davison because they have an invention idea but lack the technical skills or equipment needed to design it and make a product sample and packaging that will make the invention more attractive to entities that may wish to license the right to manufacture and sell it.  (*Id.* ¶ 2.)  Davison follows an intensive, multi-step process to provide various services to its clients—including creating presentation materials, product samples, and packaging materials that optimize the functionality and potential distribution of its clients' inventions—so that they can maximize the value of the idea and present a professional appearance from the outset.  (*Id.* ¶¶ 5–13.)  In short, Davison gives clients the support that they need to turn their own ingenuity into future success.  (*Id.* ¶ 16.)  And while Davison obviously does not guarantee that any invention will turn a profit, it works to put its clients in the best possible position to succeed.  (*Id.*)

Courts have repeatedly found that businesses with a similar focus on providing individuals with the foundations for potential future success meet the everyday needs of the community.  For example, in *Selz v. Investools, Inc.*, Case No. 2:09-CV-1042(TS), 2011 U.S. Dist. Lexis 9364, *2 (D. Utah Jan. 27, 2011), the employer sold "products and services which educate individuals on how to personally invest in exchange markets online and aid them in doing so."  The court found that this industry had a retail concept because it was giving its clients the tools to become better investors, and investing "is a basic need of members of the community in today's world."  *Id*. at *18–19, 22.  Whether those investments were profitable was irrelevant; the mere fact that the company's services assisted the would-be investors was enough.  Similarly, in *Viciedo*, the court found that a business that provided computer training classes had a retail concept because such training enhanced the clients' computer abilities and allowed them to be more productive members of the community (by, among other things, using the skills they learned in their own professional pursuits).  246 F. Supp. 2d at 893–94.  Like these businesses, Davison's services help its clients build upon their own natural abilities to position themselves for future success, which is a plain everyday need.

Finally, Davison functions at the end of the stream of distribution, dispenses services in small quantities, and does not engaging in manufacturing.  Plaintiff claims that Davison "does not sell its services to the typical consumer, but rather to individuals who are seeking assistance in developing a business idea."  (Compl. ¶ VII).  This claim severely misstates the nature of Davison's business.  Davison sells customized invention development packages directly, and solely, to aspiring inventors.  (SUMF ¶¶ 2, 4, 14.)  As Judge Lancaster found in another case involving Davison in this Court, Davison is "in the business of selling services to amateur inventors."  *Fed. Trade Comm'n v. Davison Assocs., Inc.*, 431 F. Supp. 2d 548, 551 (W.D. Pa.

-13-

2006).  These individuals are both the "typical" and indeed the *only* consumer of those services.[6]
(SUMF ¶ 14).  *See also Davison Assocs., Inc.*, 431 F. Supp. 2d at 551–59 (identifying inventors
as Davison's "consumers," and noting its efforts to advertise to and secure the business of these
"consumers").[7]

  Davison's business is focused solely on the inventors who seek assistance in developing
their ideas; they alone use these services, and Davison does not in any way manufacture or
produce something later consumers could purchase.  (SUMF ¶¶ 14–15.)  Davison is well-known
in the industry for providing such services, which have been highlighted repeatedly in the media.
*See, e.g.,* Transcriptionist turns inventor, Advance Healthcare Network (Nov. 4, 2009), *available
at* http://health-information.advanceweb.com/editorial/content/editorial.aspx?cc=209442 (last
visited Dec. 27, 2013) (describing an individual's experience with Davison in developing a travel
party tray invention); Forget cubicles or workstations – O'Hara office includes pirate ship,
Pittsburgh Business Times (May 7, 2007), *available at*
http://www.bizjournals.com/pittsburgh/stories/2007/05/07/focus4.html (last visited Dec. 27,
2013) (describing Davison as a "company that helps convert ideas to products"); Stuff: It's a
bike, it's a skateboard . . ., Pittsburgh Post-Gazette (July 16, 2006), *available at* http://www.post-
gazette.com/lifestyle/2006/07/16/Stuff-It-s-a-bike-it-s-a-skateboard/stories/200607160214 (last

---

  [6] To be clear, Davison neither manufactures the products that it helps its clients develop
nor sells those products to others; those matters are left to its clients and the corporations or other
entities with which they may contract.  (*Id*. ¶ 15.)

  [7] While that action pertained to issues under the Federal Trade Commission Act that are
not relevant to the FLSA claims here, *see Davison Assocs., Inc.*, 431 F. Supp. 2d at 550, Judge
Lancaster's findings of fact relative to Davison's business model demonstrate how the company
functions and is perceived.  Further, while Davison has made some changes to its packages and
marketing efforts since that case (such that the descriptions of services there are outdated), its
focus on the individual inventor as the sole consumer remains the same.

-14-

visited Dec. 27, 2013) (describing an award-winning bike/skateboard combination that Davison developed based on a client's idea).

Moreover, both Congress and certain state legislatures have enacted industry-specific consumer protection laws designed to regulate how companies like Davison provide services to their clients; these laws further show that this business relationship exists at the end of the stream of distribution.  (SUMF ¶¶ 18–19.)  The American Inventors Protection Act of 1999 created specific prohibitions on "[i]mproper and deceptive invention promotion activities," and requires companies like Davison to disclose certain information to aspiring inventors in writing before contracting with them.[8]  35 U.S.C. § 297.  Congress recognized that companies like Davison "can be of great assistance to novice inventors by providing information on how to protect an invention, how to develop it, how to obtain financing to manufacture it, or how to license or sell the invention," but noted that this law serves as a "safeguard to assist independent inventors in avoiding becoming victims of the predatory practices" of some companies in the field.  H.R. Rep. No. 106-464, at 119 (1999).  The law creates a civil action for customers injured by false information.  35 U.S.C. § 297(b).[9]  Several states have also enacted similar consumer protections. *See, e.g.,* Ohio Rev. Code. § 1345.61 *et seq.* (requiring invention companies to provide certain

---

[8] Davison must disclose to its "customers":  (1) the total number of inventions it has evaluated over the past five years; (2) "the total number of customers who have contracted" with it over the past five years; (3) "the total number of customers known . . . to have received a net financial profit as a direct result of" its services; (4) the total number of customers known . . . to have received license agreements for their inventions as a direct result of" its services; and (5) information on other invention companies with which Davison has been affiliated.  35 U.S.C. § 297(a)(1)–(5); *see also id.* at (c)(2) (defining a "customer" as "any individual who enters into a contract with an invention promoter for invention promotion services").

[9] The related regulations also create a framework for individuals to submit complaints about companies to the federal Patent and Trademark Office.  *See* 37 C.F.R. § 4.1 *et seq.*

information to customers and instituting contract requirements in Ohio); *see also* SUMF ¶ 19 (listing other states with similar laws).

These laws—with which Davison complies (SUMF ¶¶ 18–19)—recognize that Davison operates at the end of the stream of commerce for a discrete class of customers, and provide protections so that these individual consumers are treated fairly in these business interactions.  If these individuals were not the "typical consumer" of Davison's services as Plaintiff alleges (Compl. ¶ VII), there would be no reason for these laws to exist.  Their presence reaffirms the value of these services and shows that the business relationship sits firmly at the end of the stream of distribution.

Davison's clients are of course interested in selling their inventions to the public through corporate partners who license the right to manufacture and sell the product (which occurs without Davison's assistance, since it does not manufacture or sell those items), and if they reach that point they may pass along the costs of Davison's services as overhead.  But unless the clients actually resell Davison's individualized development and design services to third parties—and they do not—that fact alone does not dislodge Davison from the end of the stream of distribution.  *See Viciedo*, 246 F. Supp. 2d at 893; *English*, 2008 U.S. Dist. Lexis 25862, at *38–39.

The result would be different if Davison manufactured the products its clients invent and sold them to retailers to sell to consumers of *those products*.  While that sort of conduct is clearly outside the bounds of the retail exception, *see* 29 C.F.R. § 779.318(a), it is not what occurred here; Davison's services are designed for and used by its clients only.  As such, Davison is a "retail or service establishment" under § 207(i), and its Sales Representatives are overtime exempt.

-16-

## CONCLUSION

As demonstrated above, there is no genuine issue of material fact here; Davison is clearly a "retail or service establishment" within the meaning of § 207(i), and because the other elements of § 207(i) are undisputed, no reasonable jury could find that its Sales Representatives were entitled to overtime premiums.  Therefore, Defendants respectfully request that the Court grant their motion for summary judgment and dismiss the Complaint in its entirety with prejudice.

Respectfully submitted,

Dated:  December 27, 2013

/s/ Amy E. Dias
Amy E. Dias (Pa. Bar No. 52935)
aedias@jonesday.com
Brandon J. Lester (Pa. Bar No. 310208)
blester@jonesday.com
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, Pennsylvania  15219.2514
Telephone:  412-391-3939
Fax:  412-394-7959

Eric S. Dreiband (*admitted pro hac vice*)
esdreiband@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  202-879-3939
Fax:  202-626-1700

*Counsel for Defendants*